**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **Hallie A. Richter** ) | |
| ) | |
| Plaintiff, ) | Case No.: |
| ) | |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| ) | |
| **Catholic Archdiocese of Kansas City** ) | |
| **in Kansas** ) | |
| 12615 Parallel Parkway ) | |
| Kansas City, Kansas 66109 ) | |
| ) | |
| and ) | |
| ) | |
| **Holy Trinity Early Education Center** ) | |
| 9201 Summit ) | |
| Lenexa, KS 66215, ) | |
| ) | |
| and ) | |
| ) | |
| **Holy Trinity Catholic School** ) | |
| 13600 W. 92nd Street ) | |
| Lenexa, Kansas 66215 ) | |
| ) | |
| and ) | |
| ) | |
| **Holy Trinity Catholic Church** ) | |
| 13615 W. 92nd Street ) | |
| Lenexa, KS 66215 ) | |
| ) | |
| ) | |
| Defendants. ) | |

## COMPLAINT FOR DAMAGES

Hallie A. Richter asserts numerous claims against Defendants as set forth herein:

## PARTIES

1.     Plaintiff Hallie A. Richter is an individual who resides at 6715 W. 157th Terrace,

Overland Park, Kansas 66223.

2.      Defendant Catholic Archdiocese of Kansas City in Kansas ("Archdiocese") is a non-profit organization operating at 12615 Parallel Parkway, Kansas City, Kansas 66109.

3.      Holy Trinity Early Education Center ("HTEEC") is a non-profit organization operating at 9201 Summit, Lenexa, KS 66215.  HTEEC is a licensed childcare facility in the State of Kansas supervised by the Kansas Department of Health and Environment ("KDHE").  HTEEC offers preschool, parents' day out programs and after school care.

4.      Holy Trinity Catholic School ("HTCS") is a non-profit organization operating at 13600 W. 92nd Street, Lenexa, Kansas 66215.  Scott Merfen is the Principal of HTCS.

5.      Holy Trinity Catholic Church ("HTCC") is a non-profit organization operating at 13615 W. 92nd Street, Lenexa, KS 66215.  Sally Kutney is the Accountant and also handles some Human Resources issues.  The Priest is Father Mike Koller.  Stan Nill is the Business Manager.

6.      Defendants are each sued individually, and collectively, together as co-employers because although separate entities, the named Defendant entities, engaged in coordinated and shared employment policies which effected Richter, namely providing employment supervision, job coaching, counseling, training, education, policies and shared human resource services.

7.      According to its website, the Archdiocese provides human resources services to the many employers within the Archdiocese: "The Archdiocesan Church recognizes the need for an over-arching human resources office to support and serve the many employers within the Archdiocese. This office is a resource to parishes, schools and other institutions in matters affecting the employee/employer relationship: policies and procedures; employment law, including Federal regulations governing the employment environment; and employee benefits and retirement."

https://archkck.org/our-church/who-we-are/offices/human-resources/

(See Ex. C attached hereto and incorporated herein).

8.      The Defendant entities named herein are closely interrelated and operate without functional distinction with respect to the matters of employment for non-ecclesiastical employees, such that the acts of one are the acts of all.

9.      The underlying dispute is secular in nature, not an ecclesiastical one.

10.      Plaintiff's underlying claims are for discrimination, harassment, and retaliation, arising out of her employment.

11.      The Defendants make important factual and legal distinctions between the Clergy and Lay employees, treating them differently and applying different policies and procedures to the distinct categories, with different benefits, retirement, compensation, and policies which applied. For example, the lay employees have a different Retirement Plan.

12.      The named Defendants were Richter's Employer, individually and collectively.

13.      Except the Archdiocese, the other entity Defendants described are located on contiguous tracts of land described collectively as the Holy Trinity Catholic Church Campus ("Campus"), situated at 91st Street and Pflumm Road in Lenexa, Kansas.

14.      Upon information and belief, the Campus property is owned by the Archdiocese.

15.      The Archdiocese human resources staff of the Archdiocese are responsible for accountability and oversight of the several employer entities within the diocese boundaries, which includes the Holy Trinity Early Education Center.

16.      The Archdiocese Human Resource personnel included Tara McGranaghan, Director of HR; Michelle Schreiber (Interim HR Director); Michele Kooiman (former employee); Tamara Long, HR Coordinator; and Maura Dodson, Archdiocese Benefits Specialist.

17.      Plaintiff worked with one or more of these individuals on all matters related to the policies, procedures, terms and conditions of employment, including pay and benefits of the employment relationship.

18.     Applications for Employment are published by and submitted to the Archdiocese. (See Ex. D attached hereto and incorporated herein by reference).

19.     Employees of the Archdiocese are covered by Kansas Workers' Compensation Laws (See Ex. C), Family and Medical Leave Act ("FMLA") (See Ex. C) and provided protection for employees with Property & Liability Insurance Programs administered by the Catholic Mutual Group insurance plans (See Ex. C).

20.     The Archdiocese HR personnel issued and administered the General Policies & Personnel Information to employees. (See Ex. E attached hereto and incorporated herein by reference).

21.     In the alternative, for any Defendant entity which are not found to be the statutory employer of Richter, such Defendant(s) are involved as appropriate Defendants herein, as they aided, abetted, incited, compelled and/or coerced the doing of the acts forbidden under the law, through the unlawful employment practices described herein, which resulted in discrimination, and retaliation of Richter.

## JURISDICTION AND VENUE

22.     This employment case arises under Federal Law.

23.     This is an action for legal and equitable relief to address the deprivation of Plaintiff's civil rights pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. ("Title VII") based upon Plaintiff's sex and gender, disparate treatment based upon sex and gender and Defendants' retaliatory conduct directed toward Plaintiff following her opposition to unlawful activity, including financial impropriety, mandatory reporting of child abuse, discrimination and disparate treatment, inappropriate and fraudulent conduct of others, failure to follow policies and reporting of discrimination to an investigative agency.

24.     Plaintiff seeks all available remedies from Defendants, including compensatory and punitive damages, costs, reasonable attorneys' fees, and equitable relief as the Court deems warranted.

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331 as the matter involves questions of federal law.

26.     Jurisdiction is proper over Defendants because they transacted business in the State of Kansas, and the discriminatory and wrongful acts alleged herein occurred in the State of Kansas.

27.     Venue is proper in this Court as all or a substantial portion of the alleged acts, omissions and occurrences giving rise to the claims asserted occurred in Johnson and Wyandotte County, Kansas.

28.     Defendants, individually and collectively, unlawfully subjected Plaintiff to unlawful discrimination and her sex and gender were contributing factors in the constructive discharge and termination of her employment in violation of the law.

29.     Additionally, Defendants subjected Plaintiff to a number of tortious acts including discrimination, retaliation and wrongful termination.

30.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Kansas Human Rights Commission ("KHRC").  The Charge alleged discrimination based upon Sex and Gender and Retaliation.  Plaintiff verified her Charge by signing the Affidavit on January 29, 2021. (The "Charge"). The Charge incorporates the Affidavit of Meghan N. Richter and includes many of the pertinent facts and circumstances which support the basis for her Charge.  (See Exhibit A attached hereto and incorporated herein by reference).

31.     Plaintiff alleges a continuing violation and pattern of ongoing discrimination and retaliation. The Charge was timely filed.

32.     Plaintiff requested that the EEOC and/or the KHRC investigate the unlawful employment practices.

33.     A Dismissal and Notice of Right to sue letter was issued.  The EEOC issued Plaintiff a Notice of Right to Sue on August 9, 2021. (See Exhibit B attached hereto and incorporated herein by reference).

34.     Upon information and belief, the KHRC has also terminated its investigation and closed its file.

35.     This action is timely filed within 90 days from the receipt of the Notice.

36.     Plaintiff timely complied with all administrative prerequisites and fully exhausted her administrative remedies prior to filing this lawsuit.

37.     Plaintiff alleges that she has suffered damages in excess of $75,000.00.

38.     The unlawful acts described herein occurred in this judicial district making venue and jurisdiction appropriate in this Court.

39.     Plaintiff was a non-ministerial lay employee.

40.     Defendants are employers or co-employers as they are affiliated and related employer entities of Plaintiff.

41.     Plaintiff was hired as an early childhood education teacher.

42.     This court should consider the Plaintiff's role at the early education center.  Plaintiff was hired primarily for her education and training in child development, elementary education and special education.

## FACTS

43.     Plaintiff was previously employed as a non-ministerial lay employee of the employer entities described and named above.

44. The Archdiocese consists of several affiliated and related employer entities, each of which was Plaintiff's co-employer. They each individually and collectively had the authority to control the terms and conditions of her employment and did so for many years.

45. Each of the entities played a role in establishing the various employment practices, including implementation of policies, enforcement of procedures, establishing Plaintiff's job descriptions, supervision, discipline, and establishing pay. There are policies issued by each which impacted the terms and conditions of Plaintiff's employment, including aspects related to insurance, retirement, leave, and benefits. The policies apply to Plaintiff as a professional educator and lay non-ministerial member of the staff; The policies distinguish between lay employees and pastoral employees.

46. The co-employer entities include the following: Holy Trinity Early Education Center ("HTEEC"); Holy Trinity Catholic School ("HTCS"); and the Holy Trinity Catholic Church ("HTCC"). Each of these entities are part of The Catholic Archdiocese of Kansas City in Kansas, which is the primary employer of Plaintiff.

47. The entities have both ministerial and non-ministerial employees. The published Policies make it clear that the Archdiocese is an Equal Opportunity Employer, following the State and Federal laws which protect employees against discrimination and retaliation.

48. These organizations explicitly state that they also follow State and Federal employment laws, including the Family and Medical Leave Act, State and Federal Regulations for Licensing of Child Care Centers; COBRA; Retirement Plans; Fair Labor Standards Act and other laws which prevent discrimination and retaliation.

49. These related and affiliated employer entities, individually and collectively, engaged in illegal acts of sex and gender discrimination, whistleblower retaliation and retaliation for engaging in protected activity.

50.     These claims are asserted against all the Co-Employer entities culminating in the involuntary termination and constructive discharge or Plaintiff's employment on July 30, 2020.

51.     The reasons stated for the termination were false and pretextual.

52.     Plaintiff was a very good preschool teacher and performed well as a Program Coordinator. The problems were not related to Plaintiff's performance; The real reason was illegal and improper discrimination and retaliation.

53.     Plaintiff Richter was a dedicated, loyal, enthusiastic, and hardworking employee for over seventeen (17) years. Plaintiff worked mostly in the classroom as an educator, but also as a mid-level manager when serving as the Program Coordinator.

54.     Plaintiff worked her way up over many years, starting as a Student Assistant/Aide while in high school, continuing to work part-time through college and then becoming employed as a full-time member of the staff after graduation from the University of Kansas.

55.     Plaintiff received her college degrees with an emphasis in child development, elementary education, and special education. Plaintiff loved teaching and being a professional educator.

56.     Mary Kay Scanlon is the Program Director for the Early Education Center. Ms. Scanlon has worked there for thirty-eight (38) years. Ms. Scanlon is Plaintiff's aunt (her mom's sister).

57.     Plaintiff graduated from the University of Kansas in 2005, receiving a Bachelor of General Studies degree in Human Development & Family Life with a concentration in Child Development and Early Intervention.

58.     In 2012, Plaintiff also received a bachelor's degree from Fort Hayes State University in Elementary Education, with a minor in Special Education.

59.     After graduation from college, Plaintiff worked as a Transitional Kindergarten Teacher in the Early Education Center.

60.     Plaintiff always received positive feedback and reviews. Plaintiff did not receive any negative evaluations or performance reviews.

61.     Plaintiff also received very positive feedback and compliments from the parents of the students in her classes.

62.     In January of 2018, Plaintiff applied for the position of Assistant Director after learning that Assistant Director Cindy Blake announced that she was intending to retire.

63.     There is a policy which cautions against the placement of immediate relatives within the supervisory authority of another immediate relative. The policy is cautionary only and does not prohibit it. The hiring was discussed, disclosed, and approved in advance.

64.     Plaintiff was considered for the position because she was the most qualified person and experienced for the position and had been there for many years.

65.     On May 24, 2018, Plaintiff was advised that Plaintiff would be able to take over for Ms. Blake.

66.     To avoid any concerns related to family relationship, Mary Kay presented a 3-person team approach.  Mary Kay told Plaintiff that Susan Smith (Assistant Director) would be her direct supervisor and made it clear that Plaintiff would report to Ms. Smith, not Mary Kay. This was implemented because Mary Kay was Plaintiff's aunt and she wanted to make sure there were no concerns.  (Upon information and belief, Plaintiff believes that Cindy Blake's last day of employment was on May 25, 2018.) This arrangement was approved.

67.     There are several overlapping rules and policies which applied to Plaintiff's employment. Specifically, the HTEEC Staff Handbook states "HTEEC is an equal opportunity

employer." (See Early Education Staff Handbook attached hereto as Exhibit F and incorporated herein by reference).

68.     There is also a HTEEC Employment Manual and a separate Employee Manual; further, there are Employee Policies issued by the Archdiocese which apply to lay employees.

69.     The Archdiocese is responsible for coordinating and enforcing the various policies and procedures, expecting compliance with State and Federal employment laws.

70.     The specific Policy mandates: "In order to provide equal employment and advancement opportunities to all individuals, employment decisions at the parish will be based on legitimate, nondiscriminatory criteria, including merit, qualifications, and abilities. Employees are assured of equal opportunity in employment with regards to recruitment, placement, training, compensation, discipline, promotions, demotions, layoffs, and all other conditions and terms of employment without discrimination on the basis of race, color, sex, national origin, age, disability, genetic information, veteran status or any other characteristic protected by law, except religion."

71.     The stated EEO Policy requires reporting and provides for protection against retaliation: "Employees with questions or concerns about any type of unlawful discrimination in the workplace must bring these issues to the attention of their immediate supervisor or the pastor. Employees can raise concerns and make reports without fear of reprisal. Anyone found to be engaging in any type of unlawful discrimination, including retaliation, will be subject to disciplinary action up to and including termination of employment."

72.     There were other policies which applied to Plaintiff from the Staff Handbook, included but not limited to the following: Employment Criteria, p. 4; Confidentiality, p. 5; Archdiocesan Benefits Program, p. 9; Dismissal, p. 12 (misconduct or incompetence); Discipline and Termination, p. 12; Progressive Discipline, p. 12; Termination (mandatory for physical abuse of a child), p. 12; and Issue Resolution, p. 21.

73.     Additionally, the Parish Employee Procedure and Policy Handbook ("Employee Handbook") provides several policies which also applied to Plaintiff's employment, including but not limited to the following: [The Policy] Applies to all lay employees, p. 2; Handbook of Archdiocesan…applies, p. 2; Diversity and Discrimination, p. 8; Harassment Policy and Code of Ethics Standards, p. 8; Employment at Will, p. 9; Position Description/Changes ("line of authority to whom the employee reports"), p.9; Confidentiality, p. 16; Hiring of Relatives, p. 17; Appraisal, Discipline, Dismissal, p. 18 ("notify the Parish Administrator as well as the Archdiocesan attorney before taking such action."); Archdiocese Policies Severance, Sec. 6.

74.     These policies were not applied to Plaintiff in a just, equitable or reasonable manner. Instead, Plaintiff was targeted for raising concerns and criticisms about matters for which Plaintiff was obligated to report or encouraged to bring forward. Plaintiff was treated differently than other employees, ridiculed and ultimately terminated for having a voice, speaking up, raising concerns, and asserting complaints.

75.     The adverse employment actions taken against Plaintiff were done without any coaching, verbal warning, or progressive discipline as promised by the Policies.

76.     In May of 2018, when Ms. Blake retired, Plaintiff was promoted to Program Coordinator of the HTEEC. Plaintiff's hiring was reviewed and approved by others (not just Mary Kay Scanlon) and did not violate the Policy. The Anti-Nepotism Policy found in the Parish Handbook (p. 17) is permissive and does not automatically prevent a family member from working within the same line of supervision.

77.     The policy in place related to the employment of family members. Plaintiff had already previously worked as a part-time and full-time staff member for many years. However, to avoid any concerns and in order to mitigate potential problems related to perceived favoritism, Mary Kay suggested a plan where the responsibilities would be shared.

78.     Plaintiff was expected to report directly to Susan Smith rather than to Mary Kay Scanlon. A meeting between Stan Nill and Mary Kay Scanlon occurred. At this time, they discussed and approved the position of Assistant Director.

79.     Mary Kay sent an email to Stan Nill and Father Mike regarding the announcement that Susan Smith would take the job of Assistant Director and Plaintiff would become the Program Coordinator. It was explained that Plaintiff would report to Susan. Susan and Plaintiff would share Cindy's responsibilities since Susan was not full time. It would take Plaintiff out of the classroom in the afternoons.

80.     Rather than replace Plaintiff, two other staff members' job shared the Preschool Teaching position. Ms. Scanlon advised that this should give Plaintiff more time to work on the website and other tasks expected of the Program Coordinator.

81.     In August of 2018, Plaintiff expressed concerns about inaccurate representations regarding fundraising and failure to disclose the true benefactor of the financial proceeds raised from the school auction. Specifically, Plaintiff complained about the information shared about fundraising for the Early Education Center. Plaintiff questioned the actual recipients of the funds at the school auction.

82.     Plaintiff learned that the money raised was not actually going to fully benefit the Early Education Center.  Plaintiff felt that the parents should know this, as they may not want to contribute.  Plaintiff believed that some parents were contributing with the misguided belief that the money they were donating went to their children's school, when in fact, it was not all going there and was being used for other general parish funding purposes.

83.     This did not seem right to Plaintiff, so Plaintiff questioned this practice.  The leadership was not happy with Plaintiff for questioning these fundraising practices.

84.     Plaintiff considered this to be financial impropriety because it was misleading the parents.  In August of 2018, Plaintiff expressed these concerns about inaccurate representations regarding what entity actually received the financial benefit from fundraising proceeds from the auction. The reports involved concerns by Plaintiff which stated related to the misrepresentation about tax exempt status and the correct entities getting the benefit of the donated funds.

85.     From this point forward, Plaintiff was targeted and unfairly scrutinized in her job.

86.     Plaintiff's Employers did not like to be challenged or questioned; they do not accept any criticism or questioning from women, expecting complete compliance and obedience to their directives.

87.     Stan Nill and Father Mike did not like transparency and discouraged any discussion, to the point of promoting secrecy and ignoring (or selectively enforcing) the written policies and procedures of the Archdiocese.

88.     Father Mike and Stan Nill intimidated any person who disagreed with them, particularly women.

89.     It was made clear to Plaintiff that everything had to go through Mr. Nill and Father Mike. If not cleared first by them, they were quickly told of everything that happened. This allowed them to create a culture of secrecy and retribution for speaking out.

90.     During her employment, Plaintiff also witnessed an incident of reportable child abuse. This occurred in December 2018 and the related investigation also occurred into early 2019. The situation involved an employee who had a grandchild in the Early Education Center.

91.     Plaintiff's claim of Retaliation relates to expressing concerns over the timing and reporting of the circumstances of an incident in December of 2018 where the teacher was accused of abusing a student (her grandchild) and the teacher (specific name redacted)) was not sufficiently

punished or terminated for her behavior. This happened right around the time of the holiday Christmas Party. Plaintiff personally witnessed the incident.

92.     Mary Kay and Plaintiff were influenced by Stan Nill and Father Koller and discouraged from immediately reporting the incident. By statue and policy, Plaintiff was a mandatory reporter.  The person who was involved in the incident which required mandatory reporting was retained and received a raise when others did not (disparate impact).

93.     The applicable policies provide examples of circumstances which would justify termination. The specific written example is if a staff member is accused of child abuse. In such instance the staff member would be placed on leave and the behavior related to verbal or physical abuse of a child would result in termination. That did not happen in this case. Instead, she was rewarded, and Plaintiff was shunned for reporting this incident.

94.     Thereafter, Plaintiff was demoted from the Program Coordinator position. Plaintiff continued to receive the same pay, but was reduced in status, title, and position. On July 30, 2019, Plaintiff was demoted from the Program Coordinator position and was returned to a teacher position.

95.     The demotion was done without any investigation as required by the Archdiocese's policy and normal practices.

96.     Plaintiff was physically removed from the office and the perception created was that there was a problem with Plaintiff's performance.

97.     The reality was that Father Koller and Stan Nill listened to the "rumor mill" and put more emphasis on their favorite employees. The message this sent was that Plaintiff no longer had any supervising authority and was demoted.

98.     Plaintiff complained to the Archdiocese HR Department during a phone conversation on August 7, 2019, following removal from Program Coordinator position.

99.     Several things concerned Plaintiff, so she provided notice of her concerns to the Archdiocese.

100.     Plaintiff sent an Email to Michelle Kooiman at the Archdiocese. The email requested a meeting with the HR Department. The email explained that Plaintiff was not a direct family member of Ms. Scanlon and therefore hiring Plaintiff for the position should not have been considered nepotism.

101.     The email specifically stated that the employee [who is accused of abusing her grandson] was protected by Stan Nill and Father Mike, when Plaintiff and others were advised by the State of Kansas to let her go. The email also reported that when Plaintiff returned from vacation, Father Mike and Stan Nill made the decision to remove Plaintiff from the role as Program Coordinator, which Plaintiff had for the past year, without having any sort of communication with Plaintiff at all. Instead, they took the word of an anonymous written letter, as well as an employee who was angry with Plaintiff, rather than meeting with Plaintiff to discuss the issues and Plaintiff's grievances.

102.     The email alerted the HR Department that Plaintiff felt bullied and singled out, and Plaintiff did not believe that any of the actions taken had been 'done by the book', according to policy or consistent with the law.

103.     The email also complained that Father Mike and Stan Nill were treating Plaintiff and Mary Kay differently because they were women. The email also referenced that Plaintiff was seeking outside legal advice.

104.     On the next day following Plaintiff's email complaint, Plaintiff also sent an email to Stan Nill and Father Koller expressing Plaintiff's complaints about demotion and removal.  The email dated July 31, 2019, complained about being wrongfully removed from her position as Program Coordinator.

105.     Plaintiff specifically complained that she had been the victim of workplace bullying by several co-workers as well as members of the parish staff. The email specifically criticized the word "nepotism" and disputed that the family relationship was a problem. The email also accused Stan and Father Koller of the following: "I feel like it was your hope that I didn't succeed. Because I was never given a chance to show you how qualified I was for the job, here's a few of the things I would have shared in an interview…."

106.     This email was very lengthy and outlined a number of key facts.  The email shared Plaintiff's grievances directly to Stan Nill and Father Mike.

107.     Plaintiff received a response Email from Stan Nill (with cc to Father Koller). The Email advised Plaintiff that Stan was trying to set up a meeting at the Archdiocese HR Office to discuss.

108.     Thereafter, on August 7, 2019, Plaintiff had a lengthy and detailed phone conversation with members of the Archdiocese Human Resources (HR) Department. The conversation included Michelle Schreiber and Michelle Kooiman (no longer employed at the Archdiocese). Plaintiff renewed her specific concerns and complaints and asked for help and shared her intent to contact and report a claim of discrimination and retaliation to the EEOC, which Plaintiff did.

109.     HR encouraged Plaintiff to move on and suggested Plaintiff convince Mr. Nill and Father Koller that Plaintiff was wanting to return to the classroom.

110.     Thereafter, on August 8, 2019, Plaintiff sent a follow up Email to Stan regarding the HR Meeting. The email reported to Stan the outcome of Plaintiff's meeting with Michelle S. and Michelle K. The email stated that Plaintiff was ready to move on and return to the classroom. However, the email also reinforced that Plaintiff had some concerns that Plaintiff "really wanted

to share with [Stan.]" Plaintiff let Stan know that "I do feel that I do need to stand up for myself and speak on my own behalf for just a minute."

111.    Plaintiff alleges that there was a situation involving favoritism and unsubstantiated workplace gossip which caused problems in the workplace. This situation involved a co-employee teacher who also taught in the HTEEC. Plaintiff was personally friends with this teacher, Erin Kelley Cronin.

112.    Ms. Cronin voluntarily left employment at HTEEC in August 2019. Erin emailed Mary Kay and said she was leaving.

113.    Erin later complained publicly on social media (Facebook) about HTEEC and included criticism about Mary Kay and Plaintiff.  Erin also sent an email directly to Stan saying that Mary Kay and Plaintiff get away with everything.

114.    After she left, Plaintiff discovered that Ms. Cronin falsified her credentials and work experience.

115.    Plaintiff had personal knowledge of Ms. Cronin's credentials and prior work experience. It was evident to Plaintiff that Ms. Cronin misrepresented her training to the next employer because she was listed on the new employer's website and the description of her work experience was not accurate. Her employer (Brighton Academy) was contacted and told about it and it got back to Ms. Cronin. Her credentials were removed, and she blamed Plaintiff for being embarrassed by the revealing disclosure of her resume fraud.

116.    Stan and Father Mike were quick to use the information provided by others against Plaintiff because they were looking for ways to punish and retaliate against her.

117.    There was no investigation of whether or not Erin Cronin had, in fact, falsified and misrepresented her work experience. Instead, Plaintiff's employer used this as a way to target Plaintiff and use the complaints of another (former) employee against Plaintiff.  They finally came

up with something they believed would satisfy their plan to get back at Plaintiff and terminate Plaintiff's employment.

118.    Plaintiff was subjected to discrimination, hostile work environment and disparate treatment on a regular and continuous basis since January of 2018.

119.    Plaintiff was subjected to retaliation for reporting what Plaintiff considered to be inappropriate and offensive conduct in the workplace.

120.    There was a clear link and causal connection between the disciplinary action Plaintiff received and the protected activity in raising fundraising concerns, reporting child abuse, asserting claims and reporting violations of policy. Retaliation also involved Plaintiff making prior claims, including to the EEOC in September of 2019.

121.    Plaintiff was subjected to a series of escalating and unwarranted adverse employment actions. The pattern of discrimination and retaliation culminated in the involuntarily termination and constructive discharge of Plaintiff on July 30, 2020.

122.    At the time of the termination, Stan and Father Mike came into the meeting with the separation documentation already filled out. They did not come to the meeting with any intent to hear Plaintiff's side of the story or otherwise discuss this with Plaintiff.  Instead, this was a results-oriented meeting where they accused and vilified Plaintiff.

123.    They raised their voices and yelled at Plaintiff.  Plaintiff was crying and listening to the verbal attacks. They were very hostile and intimidated Plaintiff to the point where she felt so terrible that all Plaintiff wanted to do was get out of the meeting.

124.    At one point, Father Mike accused Plaintiff of being "immoral." Coming from your priest, this is extremely judgmental, humiliating, shameful and hurtful.

125.    Plaintiff could not take the intense personal and verbal attacks. During the meeting and interrogation which occurred on July 30, 2020, Plaintiff felt threatened, intimidated and

badgered by the three (3) male superiors. Plaintiff's immediate supervisor was asked to leave the room.

126.    Plaintiff was so stressed from the demeaning treatment and accusations that Plaintiff resigned under duress.

127.    Plaintiff knew that they wanted her gone because they already had the separation of employment paperwork filled out when they called Plaintiff into the meeting.   Feeling overwhelmed by the situation and how she was being treated, Plaintiff blurted out "I resign."

128.    After leaving and regaining her composure, Plaintiff discussed the matter further with her husband later that night. Plaintiff sent an email to Scott Merfen the same day which informed Mr. Merfen that Plaintiff wanted to rescind her verbal resignation.

129.    On the next day, Plaintiff received a letter stating that the resignation was accepted. The letter also informed Plaintiff that they were not in a position to reconsider their decision.  This was further aggravation to the situation because they came to the meeting with the intent to terminate Plaintiff.

130.    Even following the forced termination, the Employer is monitoring Plaintiff's email accounts.

131.    As a result of these unlawful activities, Plaintiff has suffered and will continue to suffer lost wages and emotional distress.  Plaintiff is seeking all legal and equitable remedies available to Plaintiff, including but not limited to compensation for Plaintiff's lost wages and benefits (including retirement), compensatory damages for Plaintiff's emotional pain and suffering, damage to her reputation, reinstatement and front pay and benefits and costs and attorneys' fees in this action.

## COUNT I –DISCRIMINATION
## ALL DEFENDANTS

132.    Richter incorporates by reference all of the allegations contained in the preceding numbered paragraphs as though fully set forth herein.

133.    At all times relevant to this action, the Defendants have employed six or more employees and are therefore Employers as defined in the law.

134.    During her employment, Richter satisfactorily met the legitimate job expectations of her Employer.

135.    During Richter' employment, she was subjected to acts of discrimination including unfair criticism of her performance, unfair treatment and subjected to other terms and conditions of employment, pay and benefits, which others were not, subjected, as set forth herein.

136.    Richter was discriminated against and constructively discharged for unfair, pretextual reasons.

137.    Richter' gender and sex were the motivating or determining factors in her unfair and discriminatory treatment.

138.    As a direct and proximate result of Defendants' unlawful practices described herein, Plaintiff sustained damages in the form of lost salary, benefits, social security contributions, emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish.

139.    Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others.  Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against all Defendants for actual damages, punitive damages, equitable relief and attorney's fees and costs incurred herein.  Plaintiff further requests the Court enter such equitable relief as it deems just.

## COUNT II –UNLAWFUL DISCRIMINATION BASED UPON
## GENDER AND SEX
## ALL DEFENDANTS

140.   Richter incorporates by reference all of the allegations contained in the preceding numbered paragraphs as though fully set forth herein.

141.   During Richter' employment, she was subjected to acts of sex and gender discrimination, harassment, including unfair criticism of her performance, unfair denial of pay and other benefits and ultimately, constructive discharge.

142.   Richter was subjected to disparate treatment for illegal, unfair, unlawful and pretextual reasons.

143.   Richter' gender and sex were the motivating or determining factors in her unfair and discriminatory treatment.

144.   As a direct and proximate result of Defendants' unlawful practices described herein, Richter sustained damages in the form of lost salary, benefits, social security contributions, emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish.

145.   Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others.  Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against all Defendants for actual damages, punitive damages, equitable relief and attorney's fees and costs incurred herein.  Plaintiff further requests the Court enter such equitable relief as it deems just.

## COUNT III – RETALIATION
## ALL DEFENDANTS

146.    Richter incorporates by reference all of the allegations contained in the preceding numbered paragraphs as though fully set forth herein.

147.    Richter reported and objected to incidents of discrimination and unlawful employment practices of Defendants.

148.    Defendants retaliated against Plaintiff in numerous ways, as described herein.

149.    Defendants' conduct constitutes retaliation against Plaintiff for her reports and objections to discrimination, in violation of the law.

150.    As a direct and proximate result of Defendants' unlawful practices described herein, Richter sustained damages in the form of lost salary, benefits, social security contributions, emotional pain, suffering, inconvenience, loss of enjoyment of life and mental anguish.

151.    Defendants' actions were outrageous and showed an evil motive or reckless indifference or conscious disregard for the rights of Plaintiff and others.  Therefore, Plaintiff is entitled to punitive damages from Defendants to punish Defendants and to deter Defendants and others from like conduct.

WHEREFORE, Plaintiff prays for judgment against all Defendants for actual damages, punitive damages, equitable relief and attorney's fees and costs incurred herein.  Plaintiff further requests the Court enter such equitable relief as it deems just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby designates the Federal Court in Kansas City, Kanas as the place of trial.

Respectfully submitted,

**GATES SHIELDS FERGUSON**
**SWALL HAMMOND, P.A.**

/s/ Mark A. Ferguson
Mark A. Ferguson  KS# 14843
10990 Quivira; Suite 200
Overland Park, KS 66210-1284
Telephone: (913) 661-0222
Facsimile: (913) 491-6398
markferguson@GatesShields.com

**ATTORNEY FOR PLAINTIFF**