**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

HALLIE A. RICHTER,                )
                                  )
                      Plaintiff,  )
                                  )
v.                                )                    Case No. 21-cv-2520-SAC-TJJ
                                  )
ARCHDIOCESE OF KANSAS CITY        )
IN KANSAS, et al.,                )
                                  )
                      Defendants. )

## MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Protective Order (ECF No. 32). Defendants seek an order disqualifying Plaintiff's counsel (as well as other relief) because of an alleged violation of Kansas Rule of Professional Conduct 4.2 ("KRPC 4.2" or "Rule 4.2"). Plaintiff opposes the motion. The Court conducted an evidentiary hearing on July 11, 2022 and took the matter under advisement. The Court now denies the motion.

## I.    Background

On May 12 and May 13, 2022, Plaintiff's counsel, Mark Ferguson, had *ex parte* contacts about the subject matter of this lawsuit with Mary Kay Scanlon, who is Plaintiff's aunt. At the time, Ms. Scanlon was the Director of the Early Education Center ("EEC") at Holy Trinity Catholic Parish in Lenexa, Kansas. Holy Trinity Catholic Church Lenexa is a Defendant in this case. The contact was minimal; Mr. Ferguson had his paralegal send an affidavit to Ms. Scanlon for her review on May 12. He sent a follow-up email that night and a second follow-up email with a revised draft affidavit on May 13. Mr. Ferguson also called Ms. Scanlon and left a short voicemail relating to sending the revised draft affidavit. Mr. Ferguson did not speak with Ms. Scanlon on these dates or subsequently.

The May 12 and 13 contacts were not the first contacts Mr. Ferguson had with Ms. Scanlon. In August/September 2020, before Plaintiff submitted her Charge of Discrimination and filed this case, Ms. Scanlon, along with Plaintiff, consulted Mr. Ferguson. Ms. Scanlon was concerned about her own employment status and keeping her job through retirement. For a period of time, Ms. Scanlon and Mr. Ferguson had an attorney-client relationship. But this relationship ended before the May 2022 communications.

During mediation discussions in this case, Mr. Ferguson mentioned to defense counsel that he had been in contact with Ms. Scanlon. Defense counsel expressed concern that the contact violated KRPC 4.2. Defense counsel had listed Ms. Scanlon in their Initial Disclosures and had specified that all contact should be through counsel.

Although Mr. Ferguson indicates he had not anticipated this reaction and did not believe his communications with Ms. Scanlon were improper, he immediately ceased all contact with Ms. Scanlon. The parties informally brought the issue to the Court's attention. After conducting two telephone status conferences with the parties about the issue, the Court advised the parties that Defendants should file their motion on the subject and the Court would order briefing and conduct an evidentiary hearing. Defendants filed their motion for a Protective Order, Plaintiff responded, and the Court heard evidence on July 11, 2022. The parties declined the opportunity for post-hearing briefing. Accordingly, the Court is ready to rule.

Defendants seek the following relief:

> 1) disqualify Plaintiff's counsel from representing Plaintiff in this action; 2) enter a protective order prohibiting Mary Kay Scanlon from testifying as a witness to the procedural substance and underlying merits in this case; 3) order Plaintiff to produce to Defendants a list of all Defendants' employees contacted by Plaintiff or her counsel since filing of this lawsuit and provide a detailed summary of all communications and any evidence obtained; 4) enter a protective order prohibiting Plaintiff's counsel from

having additional *ex parte* discussions with Scanlon and other managerial employees of Defendants; 5) enter a protective order excluding from evidence any information that Plaintiff's counsel obtained through these *ex parte* discussions and prohibiting Plaintiff's counsel from disclosing any information received to others; 6) award appropriate sanctions to Defendants, including but not limited to the fees and costs associated with investigating this issue, preparing this motion, and preparing for the hearing on this motion; and 7) enter such other and further relief the Court deems appropriate in this matter.[1]

## II.   Legal Standards

Defendants contend Mr. Ferguson's contact with Ms. Scanlon violated KRPC 4.2. To show a violation of an ethics rule, Defendants bear the burden of demonstrating the violation by clear evidence; not speculation.[2] If Defendants were to establish there has been a violation, the Court would consider the standards for a protective order and whether disqualification is appropriate. However, for the reasons explained *infra*, the Court need not continue the analysis beyond the initial question of whether there was a violation of Rule 4.2 at all.

   A.   Language and Limits of Rule 4.2 and Relevant Comments

Rule 4.2 states as follows:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order.[3]

This Rule is easily applied when the parties are individuals. "When one or more parties is a corporation or other organization, however, an application of Rule 4.2 becomes more difficult.

---

[1] ECF No. 32 at 1–2.
[2] *Koch v. Koch Indus.*, 798 F. Supp. 1525, 1530–21 (D. Kan. 1992).
[3] Kan. S. Ct. Rule 240 at Rule 4.2 (hereinafter cited as "KRPC 4.2"). This court has adopted the Kansas Rules of Professional Conduct as the applicable standard of professional conduct. *See* D. Kan. Rule 83.6.1(a).

Because an organization functions only through its people, the question is which people affiliated in some way with the organization occupy a status or play a role sufficient to take on the attributes of the party itself."[4] Although this court has applied various tests to determine whether a Rule 4.2 violation occurred in cases where the communication at issue involved the employee of a represented organization, a universal notion informs all rulings of this court: "The rule does not create a blanket of immunities against interview with knowledgeable employees, only an ethical mandate that the attorney not interview any employee whose position equates with the employer as a party litigant."[5]

Comment 7 to Rule 4.2 provides guidance on which constituents (i.e., employees) of a represented organization fall within the scope of KRPC 4.2's "no communication" provision. Rule 4.2 prohibits *ex parte* communications with three types of employees of a represented organization: (1) an employee who "supervises, directs or regularly consults with the organization's lawyer concerning the matter"; (2) an employee who "has authority to obligate the organization with respect to the matter"; and (3) an employee "whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability."[6] The scope of Rule 4.2 in the context of a represented organization is thus limited to communications with employees "whose statements have some binding effect upon [the represented organization]."[7] Rule 4.2 protects a represented organization's right to the advice of

---

[4] *Holdren v. Gen. Motors Corp.*, 13 F. Supp. 2d 1192, 1194 (D. Kan. 1998).
[5] *Turnbull v. Topeka State Hosp.*, 185 F.R.D. 645, 652 (D. Kan. 1999).
[6] KRPC 4.2 cmt. 7.
[7] *Turnbull*, 185 F.R.D. at 652. The prohibition in place during *Turnbull* (and several other cases cited in this Memorandum and Order) was broader than it is now; nevertheless, this statement remains an accurate, high-level overview of the current version of Rule 4.2 and its comments.

counsel by prohibiting *ex parte* communication with those employees whose acts, omissions, or statements could be imputed to the organization itself.

A limiting aspect of Rule 4.2 is that it only applies to communications concerning the matter of the representation. "Constituents who interact with the organization's lawyer on other matters, or with authority to obligate or bind the organization with respect to other matters, but not with respect to the matter involved in the proposed communication, are not within the scope of [Rule] 4.2. Thus, any constituent of a corporation, no matter how senior, who does not have decision-making authority or regularly consult with the organization's lawyer *concerning the matter involved* would not be protected by [Rule] 4.2."[8]

Rule 4.2 only applies when a lawyer "know[]" a person is represented by another lawyer in the matter. As to this limitation, Comment 8 explains: "This means that the lawyer has actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances. . . . Thus, the lawyer cannot evade the requirement of obtaining the consent of counsel by closing eyes to the obvious."[9] This limitation is not explored further below because it is unnecessary for the Court's ultimate conclusion.

B.   Purpose of Rule 4.2

Rule 4.2 is intended to protect the attorney-client relationship[10] and privileged communications. Specifically, Rule 4.2 seeks to "prevent the deprivation, undermining, or

---

[8] Colorado Formal Ethics Opinion 69 (2010) at 4-120. Colorado's Rule 4.2, Comment 7 mirrors that of Kansas.
[9] KRPC 4.2 cmt. 8.
[10] *Orlowski v. Dominick's Finer Foods, Inc.*, 937 F. Supp. 723, 727 (N.D. Ill. 1996) (citation omitted).

bypassing of a client's right to the advice of counsel . . . ."[11] The key consideration is whether the alleged misconduct taints the lawsuit.[12] Rule 4.2 implicitly recognizes

> the assumed disparity in expertise between lawyers and laypeople. In theory, this incongruity in legal expertise would permit an unscrupulous attorney to take advantage of a momentarily uncounseled opponent. Further, even absent intentional misconduct by the attorney, lack of expertise also might lead the unrepresented individual to speak or act unwisely. Clients retain counsel to overcome this disadvantage. Unregulated *ex parte* communication, however, might neutralize the protection that the adverse party has sought to secure by employing an attorney.[13]

Concern for the protection of a represented party's right to advice of counsel informs the purpose of Rule 4.2. In *American Plastic Equipment, Inc. v. Toytrackerz*, Judge Waxse ruled that "[t]he purpose of Rule 4.2 is to 'protect[ ] a person who has chosen to be represented by a lawyer in a matter against possible overreaching by other lawyers who are participating in the matter, interference by those lawyers with the client-lawyer relationship and the [uncounseled] disclosure of information relating to the representation.'"[14] As such, "Rule 4.2 helps prevent[] those situations in which a represented party may be taken advantage of by adverse counsel, as 'the presence of the party's attorney theoretically neutralizes' any undue influence."[15] Rule 4.2 further helps prevent counsel from driving a wedge between the opposing attorney and that attorney's client.[16]

---

[11] *Biocore Med. Techs., Inc. v. Khosrowshahi*, 181 F.R.D. 660, 664 (D. Kan. 1998).

[12] *Id.*

[13] Stephen M. Sinaiko, Note, *Ex Parte Commc'n & the Corporate Adversary: A New Approach*, 66 N.Y. L. Sch. L. Rev. 1456, 1464 (1991).

[14] Civ. A. No. 07-2253-DJW, 2009 WL 902424, at *8 (D. Kan. Mar. 31, 2009) (citing *U.S. v. Gonzalez-Lopez*, 403 F.3d 558, 565 (8th Cir. 2005) (quoting ABA Model Rules of Prof'l Conduct R. 4.2 cmt. 1)).

[15] *Id.* (quoting *Lobato v. Ford*, No. 05-CV-01437-LTB-CBS, 2007 WL 3342598, at *15 (D. Colo. Nov. 9, 2007)).

[16] *Id.* (quoting *Polycast Tech. Corp. v. Uniroyal, Inc.*, 129 F.R.D. 621, 625 (S.D.N.Y. 1990)).

## III.   Analysis

There is not a dispute whether Mr. Ferguson communicated with Ms. Scanlon about this litigation. But there is a question whether Ms. Scanlon was a "constituent" of Defendants such that Mr. Ferguson was prohibited from speaking with her about certain topics under Rule 4.2's "no communication" provision.

Defendants assert Ms. Scanlon is a constituent of Defendants who (1) "supervises, directs or regularly consults with the organization's lawyer concerning the matter"; (2) "has authority to obligate the organization with respect to the matter"; and (3) "whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability." Plaintiff maintains Ms. Scanlon was (and is) but a fact witness—not a management-level employee who may subject Defendants to liability.

### A.   The "Matter" as Used in All Three "Constituent" Tests

A preliminary question in this case relates to what "matter" is at issue; is it Plaintiff's claims of employment discrimination and retaliation, or is it the more narrow gatekeeping issue of whether the ministerial exception applies in this case? The answer to this question impacts—to some degree—what level of managerial authority Ms. Scanlon has. The parties have discussed Ms. Scanlon's authority as to both matters, but have not clearly delineated between the two. Plaintiff loosely treats the "matter" as her claims of discrimination and retaliation.[17] Defendants discuss both.[18]

---

[17] ECF No. 34 at 13 ("Ms. Scanlon cannot provide binding testimony on the matter, which is Ms. Richter's claims of discrimination and retaliation.").

[18] ECF No. 32 at 11 ("[Ms. Scanlon] was Plaintiff's supervisor at the EEC and, even though Scanlon did not terminate Plaintiff, terminations are within her job duties. . . . And importantly, Scanlon, with her oversight over the EEC, its curriculum, and its staff, was in the position to shape and obligate the Defendants as to matters relevant to the application of the ministerial exception in this case.").

The Court determines that both the ministerial exception and the underlying discrimination and retaliation claims are the relevant matters at issue. KRPC 4.2 "only prohibits communications 'about the subject of the representation.'"[19] In Comment 7, "the matter" can be considered a shortened reference to the "subject of the representation" language in Rule 4.2.[20]

In *Biocore Medical Technologies, Inc. v. Khosrowshahi*, Judge Vratil considered whether a telephone call counsel made to the opposing party pertained to the "subject matter of the representation" when the subject of that conversation was limited to scheduling a deposition.[21] Judge Vratil ruled that "deposition schedules are clearly within the subject matter of the representation. The 'subject matter of the representation' in a litigated matter is not limited to the merits of the various claims; it includes the entire litigation process."[22] Applying Rule 4.2 as outlined in *Biocore*, Judge Waxse ruled in *Hammond v. City of Junction City, Kansas* that the communications between plaintiff's counsel and Defendant's employee clearly pertained to "the subject of the representation" where the communications dealt with: (1) the production and destruction of documents relating to the case; (2) the employee's own potential claims of discrimination against the defendant and whether the employee would join as a member of the

---

[19] *Hammond*, 167 F. Supp. 2d at 1282 (quoting a prior version of KCRP 4.2). The content of the Rule itself remains largely the same; the comments contain the major modifications.

[20] The text of Rule 4.2 also refers to "the matter"—i.e., communication about the subject of the representation is prohibited "with a person the lawyer knows to be represented by another lawyer in the matter." While the following discussion focuses on "the matter" referred to in Comment 7, the fact that the text of Rule 4.2 mentions both the "subject of the representation" and "the matter" further supports the Court's finding herein that Ms. Scanlon's authority with respect to the ministerial exception and Plaintiff's underlying discrimination and retaliation claims must both be considered.

[21] 181 F.R.D. at 671.

[22] *Id.*

class action; and (3) potential discrimination claims of other employees (i.e., other potential class members).[23]

Applying the logic of these cases to the present case—acknowledging the cases cited relate to the topic of communication referenced in Rule 4.2 and not the employee's scope of authority referenced in Comment 7—the Court finds that "the matter" as contemplated in Comment 7 to Rule 4.2 encompasses Plaintiff's discrimination and retaliation claims, as well as the ministerial exception affirmative defense. Both topics fall within the bounds of "the entire litigation process" and are therefore squarely within the broad scope of "the matter." The Court next turns to the three "constituent" tests under Comment 7.

    B.    <u>The "Constituent" Tests</u>

        (1)    *"supervises, directs or regularly consults with the organization's lawyer concerning the matter"*[24]

Defendants first argue Ms. Scanlon was off-limits for *ex parte* communications because she was "part of the leadership team at the Holy Trinity Catholic Parish and oversaw virtually all aspects of the EEC's programs, its licensing and compliance, its operations, and the hiring and firing of EEC employees."[25] Defendants claim they intended to and did consult with Ms. Scanlon regarding application of the ministerial exception, and that Mr. Ferguson interfered with their attorney-client relationship.

---

[23] 167 F. Supp. 2d at 1282–83.

[24] The Court finds the verbiage of this test to be less than clear. Does it mean the Court examines whether Ms. Scanlon (1) supervises concerning the matter, (2) directs concerning the matter, or (3) regularly consults with the organization's lawyer concerning the matter? Or do "supervises" and "directs" modify "the organization's lawyer," like "regularly consults with" does? Other courts have examined the individual's supervisory authority concerning the relevant matter, and the Court concludes that this construction makes the most sense. In any event, if the Comment is read to examine whether an individual supervises or directs the organization's lawyer, then certainly Ms. Scanlon does not meet that test.

[25] ECF No. 32 at 10.

Defendants did not meet their burden of proof on this issue. Specifically, the evidence presented before and during the hearing establishes the following:

- Ms. Scanlon was the Director of the EEC, but she specifically walled herself off from the supervision of Plaintiff. Ms. Scanlon was not involved in the direct supervision of Plaintiff or in the decision-making relating to Plaintiff's departure from employment. To avoid any concerns about nepotism or perceived favoritism, Ms. Scanlon devised a three-person team approach so that Susan Smith, Assistant Director of the EEC, would be Plaintiff's direct supervisor when Plaintiff took over as Program Coordinator—not Ms. Scanlon.[26]

- The EEC was but one program in the entire Church organization. When Defendants responded to the EEOC regarding Plaintiff's charge of discrimination, they referred to a group of "Parish Leadership," which did not include Ms. Scanlon. Ms. Scanlon testified in the evidentiary hearing that she was a member of parish leadership, but only because she was the director of a program within the parish. She described her role as serving in an advisory capacity to Father Mike.

- In August 2019, due in part to financial concerns and disgruntled employees, Ms. Scanlon testified tearfully she was given a "diminished role" and required to report to Scott Merfen, principal of the school, rather than to someone on the parish executive leadership team as in the past. Ms. Scanlon's diminished role and responsibilities continued through  May 2022 and until her retirement.[27]

_____

[26] Plaintiff's First Amended Complaint, ECF No. 18 at 9 ¶ 66, 11 ¶¶ 77–79.
[27] As an aside, at least one of Defendants' requests for relief, if granted, could very well result in an unjust consequence for Plaintiff. Defendants ask the Court to prohibit Ms. Scanlon—Defendants' own "constituent"—from testifying as a witness in this case. Given Ms. Scanlon's apparent feelings about her treatment by her employer (soon to be former employer), her

- Although Ms. Scanlon made online postings and distributed newsletters relating to the EEC's spiritual activities, Father Mike was the ultimate authority, or "the boss." He directed the spiritual teachings of the church and schools.

- Ms. Scanlon received emails from Chris Arth, general counsel for the Archdiocese of Kansas City in Kansas, on two to three occasions about Plaintiff leaving her employment. These were after Plaintiff asserted claims but before April 28, 2022. Ms. Scanlon did not "regularly consult" with Mr. Arth regarding the matter; in fact, they had not met in person or on the phone regarding the matter until June 2022, after Defendants' motion for protective order was filed. Two to three e-mails simply does not rise to the level of regular consultation that Rule 4.2 contemplates. Defendants do not claim Ms. Scanlon supervised Plaintiff, nor do they dispute Ms. Scanlon's testimony that she was not involved in the termination of Plaintiff. Instead that was handled by Father Mike, Stan Nill, and Scott Merfen. Further, although Defendants' attorney brought out the fact that Ms. Scanlon had prior communications with Jean Gorman, who served as Defendants' in-house counsel prior to Mr. Arth, the testimony is devoid of any indication that Ms. Scanlon ever communicated with Ms. Gorman about the matters at issue in the present case, let alone "regularly."

- Ms. Scanlon received a phone call from Ms. Mendoza, an attorney with Lathrop Gage (the law firm representing Defendants), on April 28, 2022, but Ms. Scanlon was headed out of town so they spoke only briefly and agreed to talk the following week. But that never happened. Ms. Scanlon emailed Mr. Ferguson on June 14 because she

---

testimony might prove most beneficial to Plaintiff. To prohibit her from testifying could possibly provide an unfair advantage to Defendants.

was supposed to meet with defense counsel and Mr. Arth on June 15 and she was concerned about the meeting and what the expectations would be for her. Mr. Ferguson never responded. Ms. Scanlon understood defense counsel and Mr. Arth represented the Archdiocese and Holy Trinity—not her. Ms. Scanlon testified she did not regularly communicate with lawyers on matters regarding the EEOC.

- Defendants point out Ms. Scanlon was designated as a person within the "line of authority," which is a term of art in Kansas—a designation for emergency procedures. The designation, however, was a technical requirement to comply with state law and regulations, and did not require or suggest that Plaintiff be in a high position of authority within the organization.

- Although Defendants listed Ms. Scanlon in their Initial Disclosures and specified all contact should be through counsel, this fact is not determinative of Ms. Scanlon's level of authority. Notably, Defendants stated that all persons listed (which included "individuals identified by Plaintiff in her initial disclosures") should be contacted through defense counsel only. Being named on the Initial Disclosures list does not automatically qualify an individual as one who falls under the Rule 4.2 "no-communication" rule.

All of these facts convince the Court that Ms. Scanlon was not (and is not) a no-communication "constituent" under the first test.

      (2)    *"has authority to obligate the organization with respect to the matter"*

Under the second criteria, Defendants claim that Ms. Scanlon qualifies because:

> Scanlon is the Director of the EEC's faith-based daycare and oversees its operations, as well as its teachers and employees. . . . She was Plaintiff's supervisor at the EEC and, even though Scanlon did not terminate Plaintiff, terminations are within her job duties.

> And importantly, Scanlon, with her oversight over the EEC, its curriculum, and its staff, was in the position to shape and obligate the Defendants as to matters relevant to the application of the ministerial exception in this case.[28]

Again, the evidence before the Court fails to satisfy Defendants' burden. In actuality, the evidence showed that, beginning in August 2019, Ms. Scanlon had a diminished role, responsibilities, and authority. By May of 2022, Ms. Scanlon had announced her retirement and a replacement program director (Jillian Pfaff) had been named in April of 2022. At that time, Ms. Scanlon did not have formal duties and supervisory responsibilities within the parish or the other programs within the parish.

During the hearing, Defendants presented evidence from Tara McGranaghan, the Archdiocese Human Resources Director and Stan Nill, the Business Manager for Holy Trinity Catholic Church. But neither employee's testimony supported Defendants' claim that Ms. Scanlon had the requisite level of authority that would place her under the "no-communication" rule. The fact that Ms. Scanlon didn't talk to Ms. McGranaghan about any human resources issues doesn't equate with a showing of authority. And Mr. Nill repeatedly testified that he wasn't aware of things that may have impacted Ms. Scanlon's level of authority. His testimony did not add any substance to Defendants' presentation of evidence.

Defendants also failed to show that Ms. Scanlon had authority to obligate Defendants with respect to the matter at issue in this case, including the question of whether the ministerial exception applies. Under Rule 4.2, there is a critical distinction between: (1) employees whose statements can obligate an organization; and (2) employees whose statements are against the interest of the organization but who are mere fact witnesses and thus lack the authority to bind

---

[28] ECF No. 32 at 11.

the organization regarding the matter.[29] Rule 4.2 does not bar *ex parte* communication with an employee who, as witness to the events for which the organization is sued, could make a statement against the interest of the organization regarding the matter.[30] Ms. Scanlon falls into this second category that is outside the scope of Rule 4.2; her proximity as a fact witness to the events underlying the claims in this case must not be conflated with an authority to obligate Defendants.

Defendants showed that Ms. Scanlon had authority to sign contracts for the EEC and sign reports for the EEC filed with KDHE. But, Defendants failed to show that Ms. Scanlon's statements could legally obligate Defendants in any way in regard to the ministerial exception issue. Determination of whether the ministerial exception applies hinges on whether Plaintiff "performed vital religious duties" as part of "playing a vital part in carrying out the mission of the church."[31] Although Ms. Scanlon made online postings and published newsletters which may have promoted the Church's mission, there is no evidence she had a role in determining the mission or the underlying principles espoused by Defendant Holy Trinity Catholic Church Lenexa or the Archdiocese. Defendants failed to show that Ms. Scanlon's factual statements about the operations of the EEC and teacher training could obligate Defendants in regard to whether teachers at the EEC are seen by Defendant Holy Trinity Parish as playing a "vital part" in carrying out the mission of the Catholic Church.

---

[29] *See Lassiter v. Hidalgo Med. Servs.*, No. 17-cv-0850 JCH/SMH, 2018 WL 11322135, at *4 (D.N.M. Mar. 13, 2018) (citing *Kennedy v. FedEx Freight E., Inc.*, No. 07-CV-353 TCK/SAJ, 2008 WL 619361, at *2 (N.D. Okla. Mar. 4, 2008)); *see also Terra Int'l v. Miss. Chem. Corp.*, 913 F. Supp. 1306, 1321–22 (N.D. Iowa 1996); *Cole v. Appalachian Power Co.*, 903 F. Supp. 975, 977–79 (S.D. W. Va. 1995).
[30] *See Lassiter*, 2018 WL 11322135, at *4 (citing *Kennedy*, 2008 WL 619361, at *2); *see also Terra Int'l*, 913 F. Supp. at 1321–22; *Cole*, 903 F. Supp. at 977–79.
[31] *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049, 2066 (2020).

> (3)     *"whose act or omission in connection with the matter may be imputed to the organization for purposes of civil or criminal liability."*

As for the third test, Defendants claim that Ms. Scanlon "regularly acted in capacities that would be imputed to the organization."[32] Defendants then list Ms. Scanlon's regular duties with the EEC, such as overseeing employees, ensuring compliance with rules and regulations, submitting applications, adopting and implementing policies, entering contracts, and coordinating communications for the EEC. Defendants also argue that the fact Mr. Ferguson sought an affidavit from Ms. Scanlon relating to whether Plaintiff falls within the ministerial exception demonstrates that he was trying to impute Ms. Scanlon's testimony about the EEC to the organization. Defendants assert, "In short, Ferguson sought to utilize Scanlon's managerial role within Holy Trinity and the EEC for the very reason of eliciting testimony from her that would undermine Defendants' ministerial exception defense."[33]

Again, Defendants failed to meet their burden. Ms. Scanlon is a fact witness—but one person who can testify as to how things operated at the EEC. She specifically and intentionally walled herself off from employment decisions involving Plaintiff and did not participate in the Plaintiff's supervision or termination. The evidence does not support a finding that Ms. Scanlon was an employee "whose act or omission *in connection with the matter* may be imputed to the organization for purposes of civil or criminal liability."[34] In both their Motion for Protective order and during the evidentiary hearing, Defendants enumerated Ms. Scanlon's various duties and responsibilities in her role as Director and concluded that she thereby falls under Rule 4.2, without explaining how those duties and responsibilities *in connection with the matter* impute

---

[32] ECF No. 32 at 11.
[33] *Id.* at 13.
[34] KRPC 4.2 cmt. 7 (emphasis added).

liability to Defendants. Although one could imagine hypothetical situations in which Ms.

Scanlon could fall under Rule 4.2—e.g., in a case involving student injury where a KDHE

regulation was implicated—the fact that Ms. Scanlon could possibly fall under the scope of Rule

4.2 does not mean that she actually does so for the purposes of the present case. Defendants

failed to connect the managerial duties and responsibilities that Ms. Scanlon had in her capacity

as Director of the EEC with the claims at issue in the case (i.e., "the matter"). Defendants thus

failed to meet their burden to show that Ms. Scanlon falls under the third category of employee

outlined in Comment 7 of Rule 4.2.

Finally, with regard to all three constituent tests, the Court finds that the May 12 and 13,

2022 communications between Mr. Ferguson and Ms. Scanlon, which are the basis for

Defendants' motion, are not of the nature that Rule 4.2 is intended to prohibit. It is important to

remember the purpose of Rule 4.2—to protect the attorney-client relationship and privileged

communications between the constituent of a represented organization and its attorney. The Rule

is intended to prevent a lawyer from having *ex parte* communications that drive a wedge

between an opposing attorney and that attorney's client. The key consideration is whether the

alleged misconduct, that is *ex parte* communication, taints the lawsuit.

The facts in this case clearly demonstrate otherwise. Ms. Scanlon testified that she had no

conversations or communication with Defendants' attorneys regarding the matters at issue in this

case prior to the time of her communications with Mr. Ferguson in May 2022. There were no

privileged communications between Ms. Scanlon and Defendants' counsel that required

protections of Rule 4.2 at the time of Mr. Ferguson's communications with Ms. Scanlon in May

2022. The "communication" was minimal. Mr. Ferguson sent Ms. Scanlon a draft affidavit based

only on information he had gained before the lawsuit—information obtained when the two had

an attorney-client relationship. There is no evidence of any substantive discussion between Mr. Ferguson and Ms. Scanlon after this litigation began. Neither is there any evidence Ms. Scanlon provided Mr. Ferguson any substantive information material to this matter in May 2022 or subsequently, other than the handwritten notes Ms. Scanlon inserted on the draft affidavit Mr. Ferguson prepared. But, those notes were minimal, more supportive of Defendants' position than Plaintiff's, and Mr. Ferguson immediately turned the draft affidavit and mark-up over to Defendants when approached about the potential violation. These limited communications did not taint the lawsuit and are not of the type Rule 4.2 intends to prohibit.

## IV.   Conclusion

Based on the evidence presented before and during the evidentiary hearing, the Court finds that Ms. Scanlon was not a "constituent" of Defendants with whom Rule 4.2 prohibited contact. And certainly Defendants did not suffer any prejudice because of Mr. Ferguson's contact with Ms. Scanlon. Mr. Ferguson never obtained the affidavit he sought from Ms. Scanlon and he ceased all efforts to communicate with Ms. Scanlon immediately after Defendants objected. Defendants did get a declaration from her, and to defend his integrity, Mr. Ferguson was more than generous in turning over materials to Defendants to rebut the suggestion of unethical conduct.

It is worth noting that the purpose of Rule 4.2 would not be fulfilled by finding a violation here. At the time of the communications, Ms. Scanlon did not have an attorney-client relationship with defense counsel to protect. No action by Mr. Ferguson risked depriving Defendants, through Ms. Scanlon, of the right to counsel or undermining that right. No overreaching was involved and the Court finds no undue influence or exploitation. Simply put,

Rule 4.2 was not intended to prohibit communication with an employee in a situation like the one before the Court.

Because the Court has determined Mr. Ferguson did not violate Rule 4.2, there is no ethical violation on which to base a protective order or consider disqualification. Moreover, the Court made its decision without considering the evidence and documents Mr. Ferguson requested the Court take judicial notice of in a motion filed before the evidentiary hearing (ECF No. 38). The Court therefore denies that motion as moot and also denies Defendants' request for a protective order.

As a final note, both parties have asked for their attorney's fees incurred in litigating this collateral issue. Upon resolution of motions for protective orders, the "losing" party must be required to pay the reasonable expenses incurred in making or opposing the motion.[35] But this payment shall not be required if (i) the "losing" party's grounds were "substantially justified" or (ii) the "circumstances make an award of expenses unjust."[36] "Substantially justified," in the context of Rule 37, means "'not justified to a high degree, but rather justified in substance or in the main–that is, justified to a degree that could satisfy a reasonable person.'"[37] The key to determining whether attorney-fee sanctions are warranted under Rule 37(a)(5)(B) is "whether reasonable people could differ as to the appropriateness" of the denied motion.[38]

This has been an unfortunate distraction from the material issues before the Court, but both sides reasonably pursued their positions in a professional manner. The Court finds both that

---

[35] *See* Fed. R. Civ. P. 26(c)(3); Fed. R. Civ. P. 37(a)(5).
[36] Fed. R. Civ. P. 37(a)(5)(B).
[37] *Lester v. City of Lafayette*, 639 F. App'x 538, 542 (10th Cir. 2016) (quoting *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) ) (internal quotation marks omitted).
[38] *Id.* at 543; *see also Pierce*, 487 U.S. at 565 (describing motions as justified if there is a "genuine dispute").

Defendants' grounds were substantially justified and the circumstances would make an award of expenses unjust. Although the Court, after much deliberation, denies Defendants' motion, the Court also finds that reasonable people could differ about the appropriateness of the motion. In this case, the most just outcome is for each party to bear its own expenses for this detour; regroup; and proceed with case scheduling. The parties shall confer and contact the Court by email within two weeks of the date of this order with a jointly-proposed amended case schedule for proceeding.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Protective Order (ECF No. 32) is **denied**. The parties shall confer and contact the Court by email within two weeks of the date of this order with a jointly-proposed amended case schedule for proceeding.

**IT IS FURTHER ORDERED** both parties' requests for attorney's fees are denied.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Judicial Notice (ECF No. 38) is **denied as moot**.

**IT IS SO ORDERED.**

Dated this 29th day of July, 2022 at Kansas City, Kansas.

Teresa J. James
U. S. Magistrate Judge